574

(No. 33724.—

BELLEVILLE SHOE MANUFACTURING CO., Appellee, *vs.* THE DEPARTMENT OF REVENUE *et al.,* Appellants.

*Opinion filed January 19, 1956.*

LATHAM CASTLE, Attorney General, of Springfield, (JOHN L. DAVIDSON, JR., BART E. SCHMITT, and MARK O. ROBERTS, of counsel,) for appellants.

BRUNDAGE & SHORT, of Chicago, (CHARLES F. SHORT, JR., and NARCISSE A. BROWN, of counsel,) for appellee.

Mr. Justice Daily delivered the opinion of the court:

Appellee, the Belleville Shoe Manufacturing Company, an Illinois corporation whose products are normally sold to retailers for resale, sold 45,000 pair of combat boots to the United States government under a contract entered into during November, 1951. Inasmuch as the invitation to bid led appellee to believe that all deliveries of boots would be made to Department of the Army installations outside the State of Illinois, the contract price did not, according to the testimony of one of the corporate officers, include Illinois retailers' occupation tax; however, a general provision of the contract provided that if the contractor's bid was on a tax exclusive basis, the government would reimburse him for any direct taxes subsequently assessed by Federal, State or local governments. The boots manufactured under the contract were delivered during the period of February to May, 1952, and at the express direction of the Secretary of Defense all deliveries were made to the Chicago Quartermaster Depot, Chicago, Illinois, a unit of the Department of the Army. After the deliveries were completed, the Illinois Department of Revenue advised appellee that it proposed to tax the sale of boots as being a sale at retail within the meaning of sections 1 and 2 of the Retailers' Occupation Tax Act. (Ill. Rev. Stat. 1951, chap. 120, pars. 440-441.) Appellee protested and the department thereafter conducted an administrative hearing at which its referee concluded that the sale of boots to the government was not for resale, and that appellee was liable for tax and penalties in an amount totalling $7,185.74. Upon judicial review, however, the circuit court of St. Clair County held that the sale by appellee was not taxable for the reason that the sale to the government was for resale to personnel of the Department of the Army. The revenue being involved, the Department of Revenue and its director, hereafter referred to as ap-

pellants, have appealed directly to this court for further review.

The Retailers' Occupation Tax Act imposes the tax "upon persons engaged in the business of selling tangible personal property at retail." Insofar as pertinent, section 1 of the act defines a sale at retail as follows: " 'Sale at retail' means any transfer of the ownership of, or title to, tangible personal property to the purchaser, for use or consumption and not for resale in any form as tangible personal property, for a valuable consideration." These provisions of the act have been construed by this court to mean that a person is engaged in the business of selling at retail when he transfers tangible personal property (1) for use or consumption and (2) not for resale in any form as tangible personal property, and we have held that both tests must be met to justify the imposition of the tax. (*Burrows Co.* v. *Hollingsworth,* 415 Ill. 202; *Modern Dairy Co.* v. *Department of Revenue,* 413 Ill. 55). The same decisions, together with *Material Service Corp.* v. *Hollingsworth,* 415 Ill. 284, and *Fefferman* v. *Marohn,* 408 Ill. 542, are authority for the further construction that a sale at retail is defined to exclude a transfer of personal property for resale in any form as tangible personal property, for a valuable consideration. In the present case it is the contention of appellants that the sale of boots to the government was one for use and consumption and not for resale, thus rendering appellee liable for the tax. Appellee, on the other hand, claims exemption from the tax on the theory that its sale of boots to the government was for resale, for a valuable consideration, to soldiers of the Department of the Army who thus became the ultimate users and consumers of the boots.

As the issues are presented in this court, the crux of the controversy between the parties is whether the subsequent transfer of boots by the government to soldiers is a resale for a valuable consideration.

Before considering the specific circumstances under which clothing, including boots, is transferred to soldiers, it is to be noted that by the 12th and 13th clauses of section 8 of article I of the United States Constitution, Congress is given the power "to raise and support Armies" and "To provide and maintain a Navy." Congress, in turn, has delegated authority to the President to "prescribe the quantity and kind of clothing which shall be furnished annually to enlisted men" of the various services, and to "prescribe the amount of a cash allowance to be paid to such enlisted men in any case in which clothing is not so furnished them." (See: 37 U.S.C.A. sec. 305.) By virtue of such authority and as Commander in Chief of the Armed Forces, the President, by Executive Order No. 10113, has ordered the Secretary of Defense to perform the functions prescribed by the statute. Accordingly, the latter has issued various regulations covering generally the issue of clothing and payment of cash allowances to enlisted personnel.

From Army Regulations cited in the record and from the testimony of Walter Dann, the latter a witness for appellee and who serves as legal adviser to the Quartermaster General of the Army, it appears that when appellee made its sale to the government, there were different procedures by which boots were transferred to military personnel. The basic method was by initial issue, the mechanics of which are substantially as follows: Upon entry into the Army each person is furnished an initial clothing allowance which includes, among other things, uniforms, personal items such as underwear and socks, and two pair of combat boots. In theory, the major items of apparel are expected to last for three years, the normal period of an enlistment. After an enlisted person has been on active duty in a pay status for a period of six months, he then becomes entitled to a "basic" monthly cash allowance with which to maintain and replace the clothing initially issued to him. This allowance, it would appear, anticipates only the replacement

of items not normally expected to last for three years. At the end of three consecutive years of active duty, the individual, if he continues to serve in the Army, then becomes entitled to a "standard" monthly cash allowance which we interpret as anticipating that major items of clothing will need replacement. The purposes of the system are stated in paragraph 2, Army Regulations 32-20, as follows: "The purpose of the clothing allowance system is to prescribe a uniform procedure and provide clothing for enlisted personnel which will effect a saving to the Government by limiting to fixed sums the amount of money authorized for replacement and repair of individual clothing. It is also intended to create an incentive to an enlisted individual to take particular care of his clothing since repairs and replacement must be paid for by him out of his allowance and pay." Whether any of the boots purchased from appellee were in fact used for initial issue, or whether they were in fact purchased as cash replacements, is not disclosed in the record.

Dann testified that the clothing allowance system described could be deviated from only under exceptional circumstances and then only at the express direction of the Secretary of Defense. Taking judicial notice of the dates and events involved, we learn from his further testimony that when appellee sold and delivered its boots to the Army, the Secretary had excepted soldiers on duty in the Korean combat zone from the system, and that replacement of clothing was there accomplished on a straight issue basis. Again, there is no showing that any of the boots sold by appellee were transferred to soldiers in such a manner.

Another method by which clothing is transferred by the government to military personnel is through the medium of quartermaster sales stores, which are operated by the Army at military installations for the express purpose of making cash sales of various items of Army equipment,

including clothing, to authorized military personnel, both enlisted and officer. It would appear logical that it would be from such a store that enlisted persons would purchase replacements for their initial issue when the occasion arose. Although Dann expressly testified that some of the combat boots purchased from appellee were resold to officers, presumably through the quartermaster sales store, there is no showing as to what proportion of the boots were or would be transferred to military personnel by this method.

Insofar as enlisted personnel are concerned, appellee interprets the procedures described as establishing a system whereby boots are transferred in the first instance to the soldier in exchange for his services, and thereafter for cash. On this basis it is urged that all transfers of boots, whether for initial issue or replacement, are for a valuable, direct and specific consideration, so as to effect a resale for a valuable consideration within the meaning of the Retailers' Occupation Tax Act. (See: *Modern Dairy Co. v. Department of Revenue*, 413 Ill. 55; *Fefferman v. Marohn*, 408 Ill. 542.) In contending that the services of a soldier are a valuable and sufficient consideration for initial allowances of boots, appellee advances the argument that the government and the soldier stand in a bilateral contractual relationship to each other with the consideration running from the government being compensation both in money and allowances in kind, while the consideration running from the soldier is his services. The effect of such argument is, of course, that the government is selling the boots to the soldier, and that the latter is paying for them with his services. On this basis it is urged that the transfer of boots by the government to the soldier is a resale for a valuable consideration which causes the antecedent sale by appellee to be exempt from the tax.

Appellants, for their part, assert there is no proof that the boots involved were either transferred or to be transferred for cash and contend that any concept that the gov-

ernment is paying for the services of a soldier with clothing is repugnant to the constitutional provision which invests Congress with power to "raise and support Armies" and to the statute which empowers the President to prescribe the quantity and kind of clothing to be "furnished" annually to enlisted personnel. Stated differently, it is appellants' position that the government has a duty to furnish military equipment to its enlisted personnel, and that it was never intended for the government to sell the soldier his equipment either for cash or services. It is thus urged that the transfer of boots to the soldier, whether for initial issue or replacement, is not a resale as that term is generally understood or as it is used in the tax act.

We find little merit to the contention that the transfer of boots from the government to an enlisted man is a resale for a valuable consideration. Indeed there are many elements which distinguish such a transfer from a "resale" as that term is normally understood, not the least of which are that the relationship between the soldier and the government is not always voluntary, and that the soldier has no volition as to what military clothing he may buy, where he may buy it, or when he may wear it. Accordingly, we think it manifest that a determination of the nature of such a transfer must be found in the Federal enactments from which it arose. Both the statute empowering the President to prescribe uniform or cash allowances for enlisted personnel and the executive order directed to the Secretary of Defense, are couched in terms which state that "clothing shall be furnished annually to enlisted men" and that cash allowances shall be paid "in any case in which clothing is not so furnished to them." When the term "furnished" is considered along with the constitutional language which speaks of *supporting* and *maintaining* armed forces, it negates, in our opinion, any concept that Congress intended for the Army to sell a soldier his uniform, or that the soldier should be deemed to pay for it either in

cash or services. Such language imports, rather, an intention of the government to assume the duty of furnishing clothing to enlisted personnel, and it is our belief that the Army Regulations upon which appellee relies must be read in such light. Thus, whether an enlisted man is issued clothing in kind or is given a monetary allowance with which to buy it from a quartermaster store, we believe it is but a fulfillment of the duty Congress has seen fit to assume. True, the system may be in the best interest of economy as the Army Regulation intends, but we see no valid reason to say that it has the effect of placing the soldier and the government in the status of buyer and seller.

Nor do we think that appellee is aided by the contention that the relationship between the government and the soldier is no different than that of parties to any other bilateral contract. It is to be admitted, as appellee points out, that an enlistment has been regarded as a contract with mutual obligations and considerations running between the soldier and the government. (6 C.J.S., Army and Navy, sec. 21a(3).) The same authority, however, states that "it is a contract of a peculiar nature, and in certain respects widely different from ordinary contracts between individuals." The differences are in part described in *United States* v. *Cottingham*, 1 Rob. (40 Va.) 615, as follows: "* * * it wants one of the usual requisites of contracts, a reciprocal obligation in regard to the subject matter. On the one hand, the recruit is bound to serve during the full term of his enlistment; but on the other, the government is not bound to continue him in service for a single day, but may dismiss him * * * with or without cause * * *. It has moreover a feature not to be found in most contracts; namely a power in one of the parties to compel specific performance from the other by the exercise of physical force. * * * These important traits of the engagement result not so much from the specific terms of the contract but from the relation in which it places the

parties toward each other; a relation of authority and control on the one side and of obedience and submission on the other." As evidenced by the pertinent Federal statute and executive order, we think it likewise true that whatever the engagement between the government and the soldier may be termed, it places them in a relationship which, because of its peculiar nature, makes it incumbent upon the government to furnish the soldier with suitable and necessary equipment for the duties to be performed. When it is also considered that many of our soldiers are drafted into the Army, we find little basis for saying that the relationship between the government and the soldier has, as one of its conditions, the condition that the soldier will purchase his military clothing and equipment.

For the reasons stated, therefore, we are of the opinion that the transfer of combat boots to enlisted personnel, whether it be for initial issue or for replacement, is not a resale either in fact, or within the contemplation of the governing statutes. In principle the transfer is analogous to the one under consideration in *Fefferman* v. *Marohn,* 408 Ill. 542. There the State had assumed the duty of caring for patients in its hospitals and institutions and purchased items incident to their care. We held such sales to be sales at retail over the contention that the patients were the ultimate users and consumers. In the present case, the government has assumed the duty of equipping its soldiers, and the boots in question have been used and consumed to fulfill that duty with no intention that the transfer would constitute a resale. The sale of boots by appellee is thus a sale at retail within the definition of the act and subject to the tax.

In the course of Dann's appearance at the administrative hearing, he testified that some of the boots sold by appellee to the government were resold to officers who, as far as we can ascertain, are charged with the duty of purchasing their own military clothing. The referee, however, held the

appellee taxable even on boots so resold for the reason that there was no proof either as to amounts actually resold in such a manner, or of the percentage which would be so resold. Appellee appears to argue here that the limited evidence of resale to officers is alone sufficient to exempt its sale to the government from the tax, and contends that it was not required to prove how each pair of boots was sold. Such an argument overlooks the observation of this court in *Modern Dairy Co.* v. *Department of Revenue,* 413 Ill. 55, 67, that the entire scheme of the act will make vendors liable for the tax on some sales and not liable on other identical sales to the same purchaser. When such a condition arises, we think it is incumbent upon the vendor claiming the partial exemption, to establish the proportion of the sale claimed to be exempt by satisfactory proof. Assuming but not deciding that the transfer of boots to officers was a resale, we agree with the referee that the burden was not met in this case.

From a consideration of the entire record we conclude that the sale of boots by appellee was a sale at retail within the contemplation of the Retailers' Occupation Tax Act, and that the circuit court was in error when it found no liability for the tax and penalties assessed. The judgment of the circuit court of St. Clair County is therefore reversed.

*Judgment reversed.*